UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 22-cr-01373-DMS-1 |
| Plaintiffs, | |
| v. | **ORDER DENYING DEFENDANT'S MOTION FOR NEW TRIAL** |
| HECTOR DAVID IBARRA, | |
| Defendant. | |

Before the Court is Defendant Hector Ibarra's Motion for New Trial following his conviction by jury of conspiracy to transport aliens and related counts. (ECF No. 151.) Defendant argues that a new trial is warranted because the Court wrongly restricted defense counsel's closing argument in violation of Defendant's Sixth Amendment right to present a complete a defense. Because the Court did not improperly restrict defense counsel's closing argument, Defendant's motion for new trial is **DENIED**.

## I.     BACKGROUND

On June 16, 2022, Defendant Ibarra was indicted on three charges: one count of conspiracy to transport aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (v)(I); and two counts of attempted transportation of aliens in violation of § 1324(a)(1)(A)(ii) and (v)(II). (Indictment, ECF No. 21.) On March 22, 2023, a jury convicted Defendant on all counts. (Verdict, ECF No. 125.)

The facts are as follows.  On June 8, 2022, at 1:27 p.m., Edik Howard ("Howard") applied to enter the United States through the San Ysidro Port of Entry.  He was driving a Hyundai Santa Fe SUV and was its sole visible occupant.  Howard stated that he was the owner of the Hyundai and was crossing to register the car under his name.  During the pre-primary inspection, Customs and Border Protection (CBP) officers discovered two undocumented persons in a specially built secured compartment in the rear of the vehicle.  The officers took Howard into custody and the two individuals (who could not exit the compartment without assistance) were removed from the car unharmed and returned to Mexico.

CBP officers interviewed Howard shortly after taking him into custody.  Howard denied knowledge of the people in the car.  Howard agreed to allow the officers to review his phone, and the officers saw that a person, "Mike," had texted Howard an address to which the car should be delivered.  The officers believed Howard was set up by Mike and that Howard did not know he had people in the car.  They asked Howard to make a controlled delivery of the car to the address specified by Mike.  Based on Howard's possession and control of the car, CBP asked for Howard's consent to place a GPS tracking device and audio recording device in the car, to which Howard agreed.

Howard drove the Hyundai to the address Mike provided—a shopping center parking lot in Chula Vista, California—and left the car there around 2:00 PM.  At 2:47 PM, Defendant Ibarra arrived at the parking lot, took possession of the Hyundai, and drove off.  CBP officers followed Defendant out of the parking lot.  Defendant drove erratically and evasively at a high speed, making it difficult for the officers to follow him.  With the assistance of the GPS tracker, the officers tracked the Hyundai to a nearby park, but no one was inside the car when they arrived.  Three bystanders informed the officers that they observed Defendant exit the Hyundai and run up a dirt trail.  Agents pursued him, found Defendant hiding behind a tree, and arrested him.

The recording device was running the entire time Defendant was in the Hyundai and captured him talking on his cell phone to an unknown conspirator and seemingly calling

out to persons he believed were secreted in the car to ask if they could get out:

| | |
|---|---|
| Ibarra: | Well [*unintelligible*] they're still alive. |

. . . .

| | |
|---|---|
| Unidentified Male: | [*inaudible*] Are they alright? |
| Ibarra: | Yeah, yeah, yeah, yeah. I got – I got [*inaudible*] |
| Unidentified Male: | Oh okay [*inaudible*] |
| Ibarra: | Yeah. They're in the back. [*unintelligible*] Hey! Can you *(plural)* get out, or not?  Take another door. Fuck! |

(Forensic Bilingual Tr. & Translation of Audio Recording ("Tr. of Audio Recording") at 2–3, ECF No. 104-2.)

In reviewing the contents of Howard's cell phone, CBP officers identified "Mike" as Michael Mayfield ("Mayfield").  On June 12, 2022, Mayfield was arrested at the San Ysidro Port of Entry after entering the United States from Mexico.  On June 16, 2022, a grand jury returned an indictment charging Ibarra and Mayfield as coconspirators with the charges above.  (Indictment.)  Mayfield reached a plea deal.  Defendant Ibarra elected to go to trial.

## II.   TRIAL AND PROCEDURAL HISTORY

Defendant's trial began on Monday, March 20, 2023, and continued through Wednesday March 22, 2023, when the jury returned guilty verdicts on all counts.  The audio recording was not admitted at trial.  Defendant moved to suppress the recording of the phone call, arguing it was unlawfully obtained in violation of the Fourth Amendment to the United States Constitution and the Wiretap Act, 18 U.S.C. § 2511(1)(a).  (Def.'s Mot. to Suppress 8–10, ECF No. 62.)  In response, the United States agreed to self-suppress the recorded call as it was obtained in violation of the Wiretap Act.  (United States' Response to Def.'s Mot. to Suppress at 21–22, ECF No. 66.)

At trial, defense counsel stated in his opening statement: "[W]hat the evidence will show in this case is that Mr. Mayfield has tricked at least three people into being involved

in alien smuggling or transporting undocumented people without their knowledge." (Trial Tr., Day 1, at 207, ECF No. 145.) Counsel identified Elias Arreola ("Arreola") and Howard as the first two people Mayfield tricked. (*Id.* at 207–10.) Counsel continued: "The third person that Mr. Mayfield tricked is my client, Mr. Ibarra." (*Id.* 210.) Counsel then argued that Defendant's conduct was more consistent with someone who thought he was smuggling money rather than people. (*Id.* at 210–12.)

After the United States presented its case-in-chief, Defendant elected to present a defense. Defendant called several witnesses. The first witness was CBP Officer Genaroleon Guerrero, the officer who arrested Arreola at the port of entry on June 7, 2022. (Trial Tr., Day 2, at 409, ECF No. 143.) Officer Guerrero testified that Arreola discovered an alien in the hatchback area of his car and "kicked" that person out of the car in the pre-primary area. (*Id.* at 414.) The defense also introduced the port of entry video depicting the encounter and corroborating Arreola's statement that he was tricked by Mayfield, first learned of the person hidden in his vehicle at the port of entry, and thus, kicked him out of car in the pre-primary area of the port of entry. (*Id.* at 401.)

The second witness was CBP Officer Julio Corrales, the case agent who investigated Arreola. Officer Corrales testified that Arreola told him in interviews that he agreed to smuggle money from the United States to Mexico and Mayfield tricked him by placing an alien in the car before he entered the United States. (*Id.* at 427–28.) Officer Corrales said he believed that Mayfield tricked Arreola. (*Id.* at 435.) Defendant introduced clips of a recorded interview with Arreola[1] and text messages between Arreola and Mayfield to show that Arreola agreed to smuggle money rather than people. (*Id.* at 431–34.)

The third witness was Howard, the driver of the Hyundai at the port of entry. Howard testified that he reached an agreement with Mayfield whereby Howard would

---

[1] Due to Arreola's unavailability at trial, the Court ruled that the video clips were admissible under Fed. R. Evid. 807, the residual exception to the hearsay rule, because the statements therein were supported by sufficient guarantees of trustworthiness and the evidence was more probative than other evidence that could be obtained through reasonable efforts.

drive the car from Mexico into the United States and in exchange, Howard would keep the car.  (*Id.* at 451.)  Howard said he was supposed to drive the car to a specified location where he would receive $2,300 to register the car in his name and to pay other expenses. (*Id.* at 461.)  Howard testified that he did not agree to smuggle aliens or money across the border for Mayfield, and he felt that Mayfield set him up by placing aliens in the car without his knowledge prior to entering the United States.  (*Id.* at 461–62.)

The fourth witness was CBP Officer Alex Lahbabi who was involved in investigating Howard after he presented himself to the port of entry driving the Hyundai with the aliens concealed within it.  (*Id.* at 468–69.)  Officer Lahbabi testified that he spoke with Howard at the port of entry and said that Howard denied knowledge of the aliens in his vehicle.  (*Id.* at 469–70.)  Officer Lahbabi stated that Howard consented to a search of his cell phone and Officer Lahbabi found text messages between Howard and Mayfield about crossing a car.  (*Id.* at 469–71.)  Officer Lahbabi testified that he told Howard at the port of entry that Mayfield likely set him up.  (*Id.* at 470–71.)

At the close of evidence on the second day of trial, and outside the presence of the jury, Defendant proposed the following theory of defense jury instruction: "Mr. Ibarra's theory of defense is that he is not guilty of all three charges because he was tricked by Mr. Mayfield, or someone working on Mr. Mayfield's behalf, into believing that he was picking up a car with money, not undocumented aliens."  (Def.'s Proposed Theory of Defense Instr., ECF No. 162.)  The United States objected, pointing out that the argument is objectively false and that California Rule of Professional Conduct 3.3 precludes counsel from misleading the jury about facts known to be untrue.  (Trial Tr., Day 2, at 531.)  The United States further argued that the audio recording, "which . . . is an admission to knowledge of bodies in the vehicle," proves that Defendant's proposed theory of defense was objectively false.  (*Id.* 530–31.)  The Court rejected Defendant's proposed instruction and expressed concern that Defendant may have put on a misleading defense which opened the door to admission of the suppressed recording in a rebuttal case.  (*Id.* at 544–48.)  The Parties submitted supplemental briefs that night on whether the defense had opened the

door to the United States introducing Defendant's recorded phone call in rebuttal, and on the scope of what the defense could argue in closing argument to avoid the suppressed recording coming into evidence in a rebuttal case. (*See* Def.'s Suppl. Br., ECF No. 116; United States' Suppl. Br., ECF No. 117.)

The next morning, outside the presence of the jury, the United States informed the Court that it would not move to introduce the recording but requested that the Court limit Defendant's closing argument. (Trial Tr., Day 3, at 571, ECF No. 147.) The Court explained that defense counsel could argue in closing that the United States had not met its burden of proof but should not argue that Defendant himself was tricked, that there was any link between Defendant and Arreola and Howard, or that Defendant believed he had contraband other than human beings. (*Id.*) The Court tentatively ruled that if defense counsel made arguments that were contradicted by the suppressed recording, it would entertain a motion from the United States to admit the recording as rebuttal evidence. (*Id.* at 585.) After inviting argument from counsel, the Court modified its tentative ruling and explained to defense counsel: "I am not going to preclude you from making any closing argument you desire to make." (*Id.* at 588.) However, the Court clarified to defense counsel that he would open the door to admitting the audio recording in rebuttal if he made "an argument that we know is not true – and we know it because we have the evidence, the recording." (*Id.*)

In closing argument, defense counsel adhered to the Court's initial guidelines. Defense counsel began: "This is a case about Michael Mayfield's web of deception and deceit," (*id.* at 606), explained that Mayfield had tricked Arreola and Howard, (*id.* at 611–13), and then argued that the United States had failed to meet its burden of proof, (*id.* at 628). Defense counsel did not argue that Mr. Ibarra was tricked. In rebuttal, the United States responded that there was no connection between Defendant and the incidents with Arreola and Howard. (*Id.* at 630.) Later that afternoon, the jury returned guilty verdicts.

On April 3, 2023, Defendant filed a motion to set bail. (ECF No. 127.) One of Defendant's arguments was that the Court should set conditions for release because there

was a likelihood that the Court would grant a new trial due to the improper limitation it placed on defense counsel's closing argument. (*Id.* at 3–6.) The Court denied the motion. (Minute Entry, ECF No. 132.) Defendant filed the present motion on June 2, 2023. (Def.'s Mot. for New Trial.) The United States filed its Opposition on June 10, 2023. (United States' Response in Opp'n to Def.'s Mot. for New Trial, ECF No. 159.) The Court heard argument on Defendant's motion on June 16, 2023.

### III.   LEGAL STANDARD

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A district court may grant a motion for new trial if it finds that a "serious miscarriage of justice may have occurred." *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000). "The burden of establishing that a new trial is warranted rests with the moving party." *United States v. Berckmann*, No. CR 17-00710 SOM, 2018 WL 5778396, at *2 (D. Haw. Nov. 2, 2018) (citing *United States v. Endicott*, 869 F.2d 452, 454 (9th Cir. 1989)), *aff'd*, 817 F. App'x 494 (9th Cir.), *and aff'd*, 971 F.3d 999 (9th Cir. 2020). However, the government "bears the burden of proving that constitutional errors," if present, "are harmless beyond a reasonable doubt." *Endicott*, 869 F.2d at 454.

### IV.   DISCUSSION

Defendant argues he is entitled to a new trial because the Court's restrictions on counsel's closing argument violated his Sixth Amendment right to present a complete defense. For the reasons explained below, the Court disagrees and denies Defendant's motion.

### A. Sixth Amendment Right to Present a Closing Argument

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence." U.S. Const., amend. VI. This requires that a criminal defendant be afforded "a meaningful opportunity to present a complete defense," *United States v. Brown*, 859 F.3d 730, 733 (9th Cir. 2017) (quoting *United States v. Stever*, 603 F.3d 747, 752 (9th Cir. 2010)), which includes the right to

argue any theory of defense in closing supported by at least some evidence presented at trial and reasonable inferences therefrom. *See United States v. Miguel*, 338 F.3d 995, 1001–03 (9th Cir. 2003).

However, a court has significant discretion to limit closing arguments. "A district court certainly retains the power to preclude closing arguments on defense theories that are not supported by the evidence." *Id*. at 1001. The Supreme Court has instructed:

> The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations. He may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant. He may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial.

*Herring v. New York*, 422 U.S. 853, 862 (1975).

Ordinarily, "a district court's limitation on a closing argument is reviewed for an abuse of discretion." *United States v. Lazarenko*, 564 F.3d 1026, 1043 (9th Cir. 2009). However, "whether a defendant has been deprived of his constitutional right to present closing argument" is reviewed de novo. *Id*. In the Ninth Circuit, "preventing a defendant from arguing a legitimate defense theory constitutes structural error," which requires automatic reversal and is not subject to harmless error analysis. *Brown*, 859 F.3d at 737 (quoting *Frost v. Van Boening*, 757 F.3d 910, 916 (9th Cir. 2014) (en banc), *rev'd on other grounds sub nom. Glebe v. Frost*, 574 U.S. 21 (2014)).[2]

---

[2] The United States cites *Glebe v. Frost*, 574 U.S. 21 (2014), for the proposition that a "restriction on closing argument is not a structural error that requires automatic reversal." (United States' Opp'n at 14.) However, *Glebe* involved a habeas petition brought by a prisoner convicted in state court. 574 U.S. at 22–23. A federal court may grant habeas relief to a prisoner convicted in state court only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States*," 28 U.S.C. § 2254(d)(1) (emphasis added). Applying this deferential standard, the question in *Glebe* was whether Supreme Court precedent clearly established that a restriction on a defendant's ability to argue a legitimate defense theory in closing argument was automatically reversible structural error. *See Glebe*, 574 U.S. at 24. *Glebe* held that there was no clearly established Supreme Court precedent on point. *Id.* at 23. But § 2254(d)(1) does not apply here. The Ninth Circuit has repeatedly held that a restriction on a defendant's ability to argue a legitimate

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1. Right to Argue Defendant was Tricked

Defendant's primary argument is that the Court deprived him of his Sixth Amendment right to present a complete defense by restricting his counsel's closing argument. Defendant argues that he should have been able to argue his proposed theory of defense: that he is not guilty because he was tricked by Mayfield into believing he was picking up a car with money, not undocumented persons. (Def.'s Proposed Theory of Defense Instr.)

First, the Court notes that it imposed no explicit restriction on Defendant's ability to make any closing argument. The Court explained: "I am not going to preclude you from making any closing argument you desire to make." (Trial Tr., Day 3, at 588.) However, the Court did indicate that if defense counsel made arguments that were contracted by the suppressed recording, it would entertain a motion from the United States to admit the recording as rebuttal evidence. (*Id.* at 585.) The Court clarified to defense counsel that Defendant would open the door to admitting the audio recording if he were to "make an argument that we know is not true – and we know it because we have the evidence, the recording." (*Id.* 588.)

To the extent Defendant argues that the Court's guidance restricted defense counsel from arguing his proposed theory of defense, such a limitation would have been proper. "[A] trial court may preclude a defense theory where 'the evidence, as described in the defendant's offer of proof, is insufficient as a matter of law to support the proffered defense.'" *United States v. Boulware*, 558 F.3d 971, 974 (9th Cir. 2009) (quoting *United States v. Dorrell*, 758 F.2d 427, 430 (9th Cir. 1985)). Defense counsel sought to argue in closing that Defendant believed he was transporting money and was tricked by co-defendant Mayfield into transporting humans. (Def.'s Proposed Theory of Defense Instr.)

---

defense theory constitutes structural error and requires automatic reversal. *See also Miguel*, 338 F.3d at 1001 ("Such an error is structural and requires reversal under our precedent.").

While a defendant is free to argue reasonable inferences supported by evidence, there was no evidence introduced at trial from which it could be reasonably inferred that Defendant believed he was transporting money.

At the June 16 hearing, the Court inquired of counsel whether there was any evidence that Defendant himself believed he was transporting money.  (Prelim. Tr. of Hr'g.) Defense counsel explained the inference could be drawn based on Defendant's manner of driving and similar incidents of Mayfield tricking others.  Defense counsel explained:

> [W]e know that Mr. Mayfield tricked two people recently and told them to go to the same parking lot in Chula Vista where Mr. Ibarra went.  Those people were tricked into thinking they were crossing or transporting money, and instead they . . . had a person in the car at the border.

(*Id.*)  While it is true Defendant offered evidence that Mayfield tricked Arreola into smuggling humans by telling Arreola he would be transporting money (not humans), Defendant introduced no such evidence about himself or Howard.  Howard testified he did not believe he was transporting humans or money.  (*Id.* at 461–62.)[3]

Defense counsel continued: "Mr. Ibarra's driving pattern is consistent with money" because (1) the "officers following him thought it was strange he didn't go in behind the Dick's Sporting Goods [to] off-load the people"; (2) Defendant's erratic, high-speed driving was "to make sure he wasn't being followed, which . . . is consistent with him believing he had valuable cargo"; and (3) Defendant's flight from the police was "indicia of him believing he had something else that was illegal."  (Prelim. Tr. of Hr'g.)  But none of this supports the inference that Defendant believed he was carrying money as opposed to some other contraband, like drugs.

---

[3] At the hearing, defense counsel stated that "Howard said that he thought he was transporting . . . gold or currency" or "something of value."  (Prelim. Tr. of Hr'g.)  However, Howard testified he did *not* agree to transport money.  (Trial Tr., Day 2, at 460–61, 466.)  And although Howard acknowledged receiving text messages from Mayfield about gold bars, he testified he did not know what Mayfield's messages meant.  (*Id.* at 467.)

No reasonable inference from the evidence introduced at trial supports the theory that Defendant believed he was transporting money.  Thus, any guidance offered by the Court concerning this proposed argument would not infringe Defendant's Sixth Amendment rights.  *See, e.g.*, *United States v. Portillo*, 692 F. App'x 376, 377 (9th Cir. 2017) (where defendant was charged with unlawful reentry, court properly restricted defense counsel's closing argument on date of defendant's reentry where defendant introduced no evidence about his reentry date); *United States v. Vining*, 224 F. App'x 487, 497–98 (6th Cir. 2007) (trial court properly instructed defense counsel to limit closing argument to "facts as they've been established at trial" and to avoid speculative statements "not supported by facts in the record or evidence presented at trial"); *United States v. Warfield*, 97 F.3d 1014, 1020–21 (8th Cir. 1996) (trial court properly prevented defense closing argument to jury regarding timing of a meeting not confirmed by evidence).

Moreover, Defendant's theory of defense is not a "legitimate defense theory," *Van Boening*, 757 F.3d at 918, as it is categorically false.  Defendant's recorded call clearly shows Defendant believed he was transporting humans, not money, drugs or any other kind of contraband.  Defendant is recorded saying "they're still alive" and "Yeah, [t]hey're in the back."  (Tr. of Audio Recording at 2–3.)  Defendant does not seriously contest the damming nature of the recorded statement, as his counsel previously described Defendant's recorded call as a "statement of guilt."  (Def's Mot. for Bond at 5.)  To allow defense counsel to argue that Defendant believed he was transporting money and was tricked into transporting humans would permit Defendant to commit a fraud on the jury.  Defendant's theory is not only unsupported by evidence, but it is also plainly false and entirely manufactured.  The Court was well within its discretion to restrict a demonstrably misleading argument.

Defendant cites *United States v. Hernandez-Meza* for the proposition that a criminally charged defendant need not "have a good faith belief in the factual validity of a defense."  720 F.3d 760, 765 (9th Cir. 2013).  However, that statement in *Hernandez-Meza* is narrowly confined to the peculiar facts of that case and not an open invitation to defense

counsel to create defenses that are not based in reality.  *Hernandez-Meza* simply held that the defendant was free to "exploit the weaknesses in the government's case."  *Id.*  As this Court explained at trial, *Hernandez-Meza* "was where the government rested and realized . . . that it had holes" in its case-in-chief, "and then asked to reopen its case-in-chief . . . . That was error.  That is very different."  (Trial Tr., Day 3, at 573.)  In *Hernandez-Meza*, the defendant properly exploited in closing argument the fact that the government had failed to prove an essential element of the crime in its case-in-chief.  720 F.3d at 763, 765.  After the defendant's closing argument, the government sought to re-open and introduce evidence to patch the hole in its case-in-chief.  *Id.* at 763.  Here, by contrast, defense counsel sought to take advantage of the suppressed evidence and make a false closing argument.  If that had occurred, the government might have moved to introduce the suppressed recording not to patch a hole in its case-in-chief, but to rebut Defendant's attempt to affirmatively mislead the jury.

### 2.  Right to Argue Mayfield May Have Tricked Others

In the alternative, Defendant argues that defense counsel should have been allowed to argue that Mayfield tricked *others* without explicitly arguing that Defendant *himself* was tricked.  That argument would have been permissible, and the Court neither restricted counsel's ability to make that argument nor suggested that such an argument might open the door to admission of Defendant's recorded statement.

As noted, a defendant has the right to argue a theory of defense supported by evidence at trial and any reasonable inferences therefrom.  *See Miguel*, 338 F.3d at 1001–03.  At the start of the third day of trial, the Court opened with "tentative observations" indicating it might "limit the parameters of the closing argument."  (Trial Tr., Day 3, at 571.)  In its tentative ruling, the Court stated that defense counsel "may not argue or infer, in any way, that Mr. Ibarra was tricked[;] may not argue that he thought he had money or some other contraband, not human beings[;] may not argue that there is any linkage, inferentially or otherwise, between Mr. Ibarra, Howard, and Arreola."  (*Id.*)  The Court continued that defense counsel may argue that there are "two discrete incidents, Mayfield

tricking Howard and Arreola, unconnected to Mr. Ibarra, other than Mayfield being the leader[,] and then focus[] on the government's failure to meet its burden of proof." (*Id.* at 572.)  The Court explained that counsel cannot be allowed to "argu[e] to a jury a theory that is known to be not true. . . . And no court can be complicit in that." (*Id.*)  The Court again clarified that defense counsel could fairly make an argument that "focus[es] on the government's failure to meet its burden, and highlight[s] that Mr. Mayfield tricked Howard and Arreola[,] [b]ut [does] not link it up to Mr. Ibarra." (*Id.* at 577.)  The Court then noted that it would "entertain the government's motion to reopen, and . . . play the recording" if the "closing argument crosses these boundaries." (*Id.* at 578–79.)

In response to defense counsel's concerns, the Court modified its ruling and made clear that it would not explicitly restrict defense counsel from making any argument, but that arguing categorically false theories would open the door to admitting the audio recording for rebuttal purposes on the government's motion.  The Court explained, "My observations about closing this morning were observations inviting your comment as to how you feel about those boundaries." (*Id.* at 586.)  The Court revised its ruling: "[Y]ou [defense counsel] can make whatever closing argument you want to make, but the government can then make whatever motion it wants to make.  Then I will make a ruling." (*Id.* at 586–87.)  The Court again emphasized to defense counsel:

> I am not going to preclude you from making any closing argument you desire to make.  I think the understanding has to be that if you make an argument that we know is not true—and we know it because we have the evidence, the recording . . . and if the government makes that motion, then I will consider that and determine whether that recording comes in.

(*Id.* at 588–89.)  The Court stated to defense counsel a third time: "[Y]ou have complete freedom to make whatever arguments you might want to make.  But the Court, of course, has to be able to entertain motions from counsel and to rule on those motions." (*Id.* at 589.)

Defendant cites the declaration of a respected legal ethics expert attached to his motion and argues that he should have been allowed to argue the following in closing:

The government has an obligation to prove beyond a reasonable doubt that

Mr. Ibarra knowingly smuggled people.  You heard evidence from Mr. Arreola and Mr. Howard that Mr. Mayfield duped each of them into smuggling people when they had agreed to smuggle only money.  You can reasonably infer from that credible evidence that Mr. Mayfield similarly tricked others into smuggling people.  You must hold the government to its obligation to prove its case beyond a reasonable doubt.

(Def.'s Mot. at 11, quoting Decl. of Edward J. McIntyre ("McIntyre Decl.") ¶ 53, ECF No. 151-1, Ex. B.)  The Court's ruling did not restrict defense counsel, expressly or implicitly, from making that kind of argument.[4]  Mr. McIntyre's suggested closing argument would have complied with the Court's guidelines and not opened the door to the audio recording, as it does not stray into the falsehood that Defendant himself was tricked; nor does it link Defendant to Howard or Arreola, for which there was no supporting evidence.  Further, that argument would have (properly) focused on the government's burden of proof and its failure to meet that burden.  It would not have opened the door.

The distinction between arguing (1) "Mr. Mayfield tricked *Defendant* into smuggling human beings when Defendant agreed to smuggle only money," and (2) "Mr. Mayfield tricked *others* into smuggling people, and you can reasonably infer that Mr. Mayfield similarly tricked *others*" is nuanced but fundamentally important to ethical advocacy and maintaining the sacred truth-seeking process of trial by jury.  "It is precisely those nuances" that distinguish an ethical closing argument from an unethical one, (McIntyre Decl. ¶ 61), and similarly, a permissible defense theory from an impermissible one.

### B. Use of Suppressed Evidence for Narrow Rebuttal Purpose Under *James*

Defendant argues that it was error for the Court to suggest that the United States could move to reopen and play the suppressed recording if Defendant's counsel made a

---

[4] There is one problem with the argument proposed by Defendant's expert in that Howard testified he never agreed to smuggle anything and no evidence was introduced that suggested Howard believed he was smuggling money.  For purposes of this analysis, however, the Court assumes defense counsel would not have argued that Howard or Defendant thought they were transporting money.

knowingly false argument to the jury.  Defendant argues that this guidance had the effect of restricting defense counsel from delivering its desired closing argument.  The Court disagrees and concludes that its guidance was proper.

### 1. The Exclusionary Rule

It is uncontested that the suppressed recording was obtained in violation of the Wiretap Act, 18 U.S.C. § 2511(1)(a),[5] and was therefore suppressed.[6]  The Ninth Circuit, and all circuit courts that have addressed the issue, have applied the constitutional exclusionary rule to statutory violations of the Wiretap Act.  *United States v. Echavarria–Olarte*, 904 F.2d 1391, 1397 (9th Cir. 1990); *see also Forsyth v. Barr*, 19 F.3d 1527, 1541 (5th Cir. 1994); *United States v. Vest*, 813 F.2d 477, 484 (1st Cir. 1987); *Anthony v. United States*, 667 F.2d 870, 879–80 (10th Cir. 1981); *United States v. Caron*, 474 F.2d 506, 508–09 (5th Cir. 1973) (predating Fifth Circuit split and binding on Eleventh Circuit).  The exclusionary rule forbids the use of evidence obtained in "violation of the constitutional rights of the defendant" in a criminal trial.  *Weeks v. United States*, 232 U.S. 383, 398 (1914).  The Supreme Court has held that the sole justification for the exclusionary rule is deterrence of police misconduct.  *See, e.g.*, *Arizona v. Evans*, 514 U.S. 1, 10 (1995) ("The exclusionary rule operates as a judicially created remedy designed to safeguard against future violations of . . . rights through the rule's general deterrent effect."); *United States v. Janis*, 428 U.S. 433, 454 (1976) (holding where "the exclusionary rule does not result in appreciable deterrence, then . . . its use . . . is unwarranted").

The exclusionary rule is subject to exceptions.  The Supreme Court has long

---

[5] "Except as otherwise specifically provided in this chapter any person who . . . intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication . . . shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5)."  18 U.S.C. § 2511(1)(a).

[6] *See* 18 U.S.C. § 2515 ("Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court . . . of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.").

22-cr-01373-DMS-1

recognized an exception for the limited purpose of impeaching the credibility of a defendant's own direct testimony. *Walder v. United States*, 347 U.S. 62, 74 (1954). The Supreme Court later carved out additional exceptions to the exclusionary rule "where the introduction of [1] reliable and probative evidence would [2] significantly further the truthseeking function of a criminal trial and [3] the likelihood that admissibility of such evidence would encourage police misconduct is but a 'speculative possibility.'" *James v. Illinois*, 493 U.S. 307, 311 (1990) (quoting *Harris v. New York*, 401 U.S. 222, 225 (1971)). *See, e.g.*, *Janis*, 428 U.S. at 459–60 (evidence obtained by state officers in violation of the Fourth Amendment may be used in federal civil proceedings because likelihood of deterring unlawful conduct by state officers does not outweigh the societal costs imposed by exclusion); *United States v. Calandra*, 414 U.S. 338, 351–52 (1974) (evidence obtained in violation of the Fourth Amendment may be used in grand jury proceedings because the expected deterrence of police misconduct from excluding such evidence is minimal and outweighed by the cost of impeding the grand jury).

In *James*, the Supreme Court held that the impeachment exception to the exclusionary rule cannot be extended beyond the impeachment of a defendant's own testimony. 493 U.S. at 320. *James* involved a prosecution for murder in Illinois state court. *See id.* at 309–10. Defendant James originally had long, straight red hair. *Id.* at 309. He admitted in an un-*Mirandized* statement to the police that he had curled his hair and dyed it black to change his appearance after the murder. *Id.* at 309–10. At trial, a defense witness falsely testified that defendant's hair had been black and curly on the day of the shooting. *Id.* at 310. The prosecutor moved to impeach the defense witness by introducing the suppressed un-*Mirandized* statement in which defendant told the police that he changed his appearance after the murder, which the trial court permitted. *Id.* The Supreme Court reversed, and held that the impeachment exception to the exclusionary rule cannot be expanded beyond the impeachment of a defendant's *own* testimony. *Id.* at 320. The Court explained that the prosecutor was wrong to use the suppressed statement to impeach a non-defendant witness for three reasons: (1) the truth-seeking rationale does not apply with

equal force because a non-defendant is adequately deterred from lying by the threat of a perjury prosecution, *id.* at 314; (2) defendants would be chilled from calling witnesses who would otherwise offer probative evidence out of fear that witnesses they cannot control might make some statement in tension with the suppressed evidence and allow the prosecutor to introduce that evidence for impeachment, *id.* at 314–16; and (3) expansion of the exception would weaken the exclusionary rule's deterrent effect on police by "enhance[ing] the expected value" of illegally obtained evidence to the prosecution. *Id.* at 318.

### 2. Analysis

*James* is distinguishable from the present circumstances. Whereas *James* concerned the impeachment of a witness's false testimony, the issue here is the persistence of counsel that he ought to be able to make knowingly false arguments to the jury. *James* is silent on the question of rebutting an attorney's knowingly false arguments, and the Court is aware of no binding precedent resolving this issue. Therefore, the Court applies the test from *James* to determine whether an exception to the exclusionary rule is warranted in this situation. The Court concludes that suppressed evidence may be admitted for the specific and limited purpose of rebutting an attorney's closing arguments that are in direct contradiction to the contents of suppressed evidence and perpetrates a fraud on the jury. *See Harris*, 401 U.S. at 224 (court cannot allow defendant to use exclusionary rule as a "shield against contradiction of his untruths").

A court may "carve[] out exceptions to the exclusionary rule . . . where the introduction of [1] reliable and probative evidence would [2] significantly further the truthseeking function of a criminal trial and [3] the likelihood that admissibility of such evidence would encourage police misconduct is but a 'speculative possibility.'" *James*, 493 U.S. at 311 (quoting *Harris*, 401 U.S. at 225); *see also People v. Edwards*, 11 Cal. App. 5th 759, 768–69 (2017) (applying *James* test and concluding that the impeachment exception to the exclusionary rule applies to a psychiatrist expert witness's testimony based on the defendant's own statements to the expert); *People v. Johnson*, 183 Cal. App. 4th

253, 282–83 (2010) (applying *James* test and concluding that an exception to the exclusionary rule applies where introduction of suppressed evidence is necessary to prevent defendant from "extrapolating a false argument from truthful testimony").  Under this test, a court may conclude that an exception to the exclusionary rule applies only if three criteria are satisfied: (1) the evidence must be reliable and probative, (2) its use at trial must "significantly further the truthseeking function of a criminal trial," and (3) the likelihood that recognizing the exception would encourage police misconduct must be no more than a "speculative possibility."

*(1) Reliable and Probative Evidence.*  The evidence here is a real-time recording of Defendant—capturing his own words while he flees from law enforcement.  Such a recording is more reliable than the non-*Mirandized* statements at issue in *James*, 493 U.S. at 310, and in *United States v. Rosales-Aguilar*, 818 F.3d 965, 968, 970 (9th Cir. 2016) (government may impeach expert witness's testimony regarding statements defendant made to the witness using defendant's contrary statements suppressed for being obtained in violation of *Miranda*), and which are routinely admitted for impeachment purposes when suppressed.  Further, the recording is highly probative and incriminating.  Defendant speaks of individuals being "alive" and "in the back" of the car.  As defense counsel himself describes, the recording is a "statement of guilt."  (Def's Mot. for Bond at 5.)

*(2) Significantly Furthers the Truth-seeking Function of a Criminal Trial.*  Defense counsel made a knowingly false statement in his opening remarks to the jury when he stated that Defendant was tricked by Mayfield's web of lies.  If counsel had made a false closing argument that Defendant was tricked in direct contradiction to the suppressed recording, introduction of the recording certainly would have "significantly furthered the truthseeking function of a criminal trial," *James*, 493 U.S. at 311, by preventing the jury from being affirmatively misled.

*(3) "Speculative Possibility" of Encouraging Police Misconduct.*  There is "no more than a 'speculative possibility,'" *James*, 493 U.S. at 311 (quoting *Harris*, 401 U.S. at 225), that admitting the recording for the narrow purpose of rebutting an attorney's knowingly

false arguments would encourage police misconduct.  It would not change the default rule that wrongfully obtained evidence is inadmissible in the government's case-in-chief at trial. So long as defense counsel refrains from making knowingly false arguments to the jury,[7] the suppressed evidence would not come in.  Therefore, unlike *James*, recognizing a limited exception to the exclusionary rule here to permit rebuttal of demonstrably false arguments (through admission of the recording) does not "significantly enhance the expected value to the prosecution of illegally obtained evidence."  *Id.* at 318.

The Supreme Court in *James* expressed concern that permitting the use of suppressed evidence to impeach a witness called by the defense could create a "chilling effect" and "deter defendants from calling witnesses in the first place" because a defendant cannot control what the witnesses will say.  *Id.*  That concern does not apply to an attorney, who can (and must) control what they will say, and can (and must) avoid making knowingly false arguments to the jury.

The Ninth Circuit and other courts have distinguished *James* where all three factors of the *James* test are met.   In *Rosales-Aguilar*, the Ninth Circuit concluded that a defendant's non-*Mirandized* statements were admissible to impeach a psychiatrist's testimony, which relayed defendant's own statements that he made to the psychiatrist.  818 F.3d at 968, 970.  In *Johnson*, the defendant was charged with several counts related to a series of robberies and a murder.  183 Cal. App. 4th at 262–70.  The defendant confessed to law enforcement in a non-*Mirandized* statement that he had committed the robberies and the murder, but the statement was suppressed under *Miranda*.  *Id.* at 270.  In a live line-up two weeks later which included the defendant, one of the robbery victims was unable to identify the defendant as the perpetrator and stated that "the guy who came in was darker." *Id.* at 275.  At trial, the defendant sought to introduce that exculpating evidence.  *Id.*  The

---

[7] California's Rules of Professional Conduct and Business and Professions Code cover this situation.  *See, e.g.*, Cal. R. Prof. Conduct 3.3; Cal. Bus. & Prof. Code § 6068(d) ("It is the duty of an attorney . . . never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law.").

trial court declined and excluded the evidence as misleading and likely to confuse the jury. *Id.* at 274, 278. In reaching that conclusion, the trial court considered the defendant's non-*Mirandized* statement admitting to the crime. *Id.* at 274. The state appellate court affirmed, holding that the trial court properly used the suppressed evidence "in a context other than the prosecution's case-in-chief so as to avoid false testimony" and "satisfie[d] the *James* balancing test." *Id.* at 282. "The [trial] court's reliance on [the defendant's] suppressed confession significantly furthered its truth-seeking function by ensuring the jury was not confused or misled by a bogus argument." *Id.* So it is here. Any parameters set by the Court for counsel's closing argument served the similar purpose of preventing the jury from being "misled by a bogus argument." *Id.* In addition, as in *Johnson*, the jury here never learned of the suppressed evidence.

Defendant cites *Rogers v. State*, 844 So. 2d 728 (Fla. Dist. Ct. App. 2003), for the proposition that "a defense lawyer's closing argument does not open the door to admit suppressed evidence." (Def.'s Mot at 7, citing *Rogers*, 844 So. 2d at 732–33.) In *Rogers*, the defendant was charged with murder and had confessed in an un-*Mirandized* suppressed statement that he committed the murder. *Id.* In closing argument, defense counsel argued that the cooperating co-defendants had an incentive to accuse the defendant of committing the murder, and that one of the co-defendants could have been the shooter. *Id.* at 731. The trial court ruled that defense counsel had opened the door to playing the suppressed confession and allowed the state to present it to the jury in rebuttal. *Id.* While presenting the confession, the defendant contemporaneously confessed, and was later convicted. *Id.* at 732. The state appellate court reversed and held that the defendant's closing argument was appropriate because defense counsel had a duty to "challenge the sufficiency and credibility of the State's proof" and could use "all reasonable inferences that might be drawn from the evidence." *Id.* at 733.

However, *Rogers* is not binding on this Court and lacks persuasive reasoning. *Rogers* never mentions *James*, and it failed to analyze whether an exception to the exclusionary rule was warranted under the test enunciated in *James*. *Rogers* is also

distinguishable.  Defense counsel in *Rogers* made arguments aimed at exposing holes in the state's case-in-chief, a clearly proper approach under the Sixth Amendment.  Counsel there exploited the fact that the co-defendants had lied to police and changed their stories in a way that implicated the defendant.  *See id.* at 731.  Counsel poked holes in the state's case-in-chief by arguing that co-defendants had an incentive to implicate the defendant "so as to minimize their own liability" and suggesting that "one of the co-defendants *could* have been the shooter."  *Id.* (emphasis added).  By contrast, defense counsel here sought to make an objectively false argument to the jury—that Defendant *did* believe he was carrying money and *was* tricked by Mayfield, all of which was contradicted by the recording.

## V.    CONCLUSION AND ORDER

It bears emphasis that defense counsel in fact made no improper closing argument and did not open the door to admitting the suppressed recording.  The United States never moved to admit the suppressed recording, and the jury never learned of the recording or its contents.  But if defense counsel had advanced the knowingly false argument, which was squarely contradicted by the suppressed recording, the Court could have properly admitted the recording for the specific and limited purpose of rebutting the false argument.  Accordingly, Defendant's motion for new trial is **DENIED**.

**IT IS SO ORDERED.**


Dated:  June 21, 2023

Hon. Dana M. Sabraw, Chief Judge
United States District Court

22-cr-01373-DMS-1